655 So.2d 623 (1995)
STATE of Louisiana, Appellee
v.
Yvonne SEPULVADO, Appellant.
No. 26948-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
*624 M. Michele Fournet, Baton Rouge, for appellant.
Richard Ieyoub, Atty. Gen., Don Burkett, Dist. Atty., and Charles E. Adams, Asst. Dist. Atty., for appellee.
Before MARVIN and HIGHTOWER, JJ., and GUIDRY, J. Pro Tem.
GUIDRY, Judge Pro Tem.
On March 24, 1992, defendant, Yvonne Mercer Sepulvado, was charged with the first degree murder of her six-year-old son, in violation of LSA-R.S. 14:30 A(5). The state amended the charge and reduced it to second degree murder, a violation of LSA-R.S. *625 14:30.1. The defendant pled not guilty and not guilty by reason of insanity. After a jury trial, she was convicted of manslaughter and sentenced to 21 years at hard labor. The defendant appeals her conviction and sentence, urging two assignments of error. For the following reasons, we affirm.

FACTS
Shortly after 2:00 p.m. on Sunday, March 8, 1992, six-year-old Wesley Alan Mercer died at DeSoto General Hospital. Dr. George McCormick, the forensic pathologist who examined the body one day after the child died, testified that the primary cause of death was failure of the heart and lungs due to severe third degree burns covering 58 percent of Wesley's body and second degree burns covering 2 percent of the body. The autopsy further revealed the existence of substantial bruises on various parts of the body and multiple head wounds. In fact, Dr. Evans, the emergency room physician who attended to Wesley, testified that the child's head wounds contributed to his death. Specifically, he testified that the burns and the blow to the head in combination caused the child's death. According to Dr. Evans, the final cause of death, as in every instance, was cardiac arrest.
The DeSoto Parish sheriff's investigation led to the arrest of Chris Sepulvado [hereinafter Sepulvado], Wesley's stepfather, and Yvonne Mercer Sepulvado, his mother. Both were charged with first degree murder and tried separately. Sepulvado was convicted as charged and sentenced to death. The defendant was tried for second degree murder and convicted of manslaughter.
The testimony elicited during the defendant's trial revealed the following facts. Chris Sepulvado and the defendant began dating in September of 1990. At that time, defendant was physically separated from her first husband. She and her four-year-old son lived with her parents. In January of 1991, Sepulvado and the defendant and her child moved to Mansfield. They began living together despite objections from the defendant's family.
Shortly thereafter, Sepulvado began to drink heavily and physically abuse the defendant. On May 10, 1991, the defendant left Sepulvado and returned to her parents' house. Sometime between the end of May and the first of July 1991, the defendant resumed living with Sepulvado, leaving her child in her mother's care. However, Sepulvado "beat" her again and she left him a second time, returning to her parents' house. After another brief stay with her parents, defendant returned to live with Sepulvado and, this time, took Wesley with her. Subsequently, Sepulvado began to abuse Wesley instead of the defendant. According to the defendant, the physical and verbal abuse that Sepulvado inflicted upon her child escalated gradually.
Defendant married Sepulvado on Thursday, March 5, 1992. The final episode of abuse against Wesley commenced the next day and ended in Wesley's death on Sunday, March 8, 1992.
On Friday, March 6, 1992, the child defecated in his pants three times, and each time he was severely punished and tortured. On the first occasion, Sepulvado tied one end of a rope around a ceiling fan and the other end around Wesley's neck, and threatened to hang the child. He forced the child to stand on a chair, hold up one leg and count. The defendant testified that her husband told her what he was doing and then immediately told her that he was kidding. The second time the child defecated in his pants, Sepulvado beat him with a belt. On the third occasion, Sepulvado shoved Wesley's head into a toilet and flushed. The defendant watched as this particular abuse occurred. Later that night, neither the defendant nor her husband fed the child, and her husband forced him to sleep on the bedroom floor.
The next day, Saturday, March 7, 1992, pursuant to Sepulvado's instructions, the defendant did not feed her child, despite the fact that Sepulvado was out of the house all day. The defendant testified that after speaking with Wesley, she became "mad at him." She admitted to hitting him, pulling his hair, and striking him in the head several times. That evening, the child was still not given anything to eat and was forced to sleep on a small trunk. The defendant made no *626 attempt to communicate with her son or to comfort him later that evening when she passed by his room and saw him lying on the trunk.
Finally, the defendant testified that on the morning of Sunday, March 8, 1992, she saw Sepulvado kick Wesley from the bedroom into the bathroom. She claimed her husband threatened to put the child in hot water if he defecated in his pants again. According to the defendant, Sepulvado made an identical threat on a prior occasion, but had let her check the water temperature to ensure it was not too hot. She claimed she thought Sepulvado was making an empty threat this time also. The defendant heard Sepulvado again order Wesley to get into the tub and then heard the child say he had to use the bathroom. She recounted that her husband repeated the order one last time, and, the child replied, "No! No!" Then she heard a "bop, splash, and nothing."
The defendant further claimed that the child walked calmly from the bathroom to the bedroom, and even made chitchat with Sepulvado for a little while. She maintained that it was not until after she and Sepulvado persuaded Wesley to eat some food, he began to vomit, fall over, and lose consciousness. She and Sepulvado finally decided to take the child to the hospital some three hours later. The physicians who treated the boy at DeSoto General Hospital could not resuscitate him, and he died as a result of the severe abuse endured by him.
On appeal, the defendant urges two assignments of error: (1) the evidence adduced at trial is insufficient to sustain a manslaughter conviction, and (2) the trial court's imposition of the maximum statutory sentence is excessive.

INSUFFICIENT EVIDENCE
In her first assignment of error, defendant argues the evidence adduced at trial was insufficient to sustain the manslaughter conviction. More specifically, she argues that the jury erred in not finding she was insane at the time of the offense. She asserts that the evidence presented in support of the insanity plea was unequivocal and uncontradicted. The state contends the evidence of insanity presented by the defense was not credible and was properly rejected by the jury. The state further contends the record fully supports the jury's findings.
The defendant was convicted of manslaughter pursuant to LSA-R.S. 14:31(A)(2)(b), which provides in pertinent part:
Manslaughter is a homicide committed without any intent to cause death or great bodily harm ... when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or Article 30.1, or any intentional misdemeanor directly affecting the person.
During oral argument, the state identified "cruelty to a juvenile" as the unenumerated felony upon which the manslaughter conviction is based. See LSA-R.S. 14:93.
The defendant's acts or failure to act, which the state argues led to the death of her son, are not in dispute. The only real issue presented is whether the jury erred in finding that the defendant did not prove by a preponderance of the evidence that she was insane and should not be held legally responsible for her behavior pertaining to the abuse and subsequent death of her son.
The state bears the burden of proving beyond a reasonable doubt each element of the crime charged. La.R.S. 15:271; State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993). In Louisiana a defendant is presumed sane at the time of the offense; the state is not required to prove sanity. La.R.S. 15:432; State v. Bibb, supra; State v. Weber, 364 So.2d 952 (La.1978). A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La.C.Cr.P. Art. 652; State v. Bibb, supra. To be exempt from criminal responsibility on the ground of insanity, a defendant must persuade the jury that he had a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him. LSA-R.S. 14:14; State v. Roy, 395 So.2d 664 (La.1981).
*627 The determination of sanity is a factual matter reserved to the jury or other fact finder. State v. Claibon, 395 So.2d 770 (La.1981). The standard of review when a defendant pleads the affirmative defense of insanity and claims the record does not support a finding of guilty beyond a reasonable doubt is whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence in a light most favorable to the prosecution, could conclude the defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense. LSA-R.S. 14:14, 15:432; LSA-C.Cr.P. Art. 652; State v. Roy, supra, (extending the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir. 1986), writ denied, 499 So.2d 83 (1987).
Defendant alleges that her inability to distinguish between right and wrong was the product of extended physical and mental abuse which rendered her unable to act independently of her husband's commands or even to perceive reality accurately under his influence. In support of her insanity defense, she presented lay and expert testimony regarding her family history, her life with Chris Sepulvado and her mental state.
Dr. Gene Moore, a psychiatrist, testified that she evaluated the defendant on three occasions subsequent to Wesley's death. According to Dr. Moore, the defendant suffered from "battered woman syndrome," "induced psychotic reaction," and "abuse psychosis." Dr. Moore concluded Sepulvado preached "mind control" over the defendant. She said the defendant's distorted perception of reality prevented her from distinguishing between right and wrong, and, upon observing Wesley after he was injured, she had a delusion in which he was not seriously injured.
Dr. Seiden, a psychiatrist, testified for the state as a rebuttal witness. He asserted that the diagnosis made by Dr. Moore was incorrect because the criteria to support the diagnosis were lacking. According to Dr. Seiden, induced psychosis requires two people, a psychotic dominant person and a dependent person who enters into the psychosis to stay in the relationship. Dr. Seiden determined that Sepulvado was not psychotic, based upon his prior examination of the man. Therefore, Dr. Seiden concluded that Dr. Moore's diagnosis was incorrect because it was based upon the incorrect assumption that Chris Sepulvado, whom she had never evaluated, was psychotic.
Betty Bruce, a psychiatric social worker, also testified on behalf of the defendant. She began to see the defendant on a weekly basis subsequent to Wesley's death. Ms. Bruce said the defendant suffered from some brain damage which affected her reason and judgment. She admitted, on cross-examination, that she had no medical degree and was not qualified to diagnose psychiatric illnesses.
The defense also presented Dr. Robert Geffner, a psychologist and president of the Natural Resource Center on Family Violence and Sexual Assault. He evaluated the defendant and reviewed records from Dr. Moore and Ms. Bruce. He testified that defendant suffered from "post traumatic stress disorder" (PTSD) and "dependent personality disorder." He concluded that the defendant probably had a learning disability and some brain damage. He further concluded that she was psychologically paralyzed and suffered perceptual distortions. He admitted that he was not a medical doctor and that "it was not clear to [him] if at the time [of the offense] she really did not know that what she was doing was wrong." Dr. Geffner relied on information provided mostly by the defendant.
In rebuttal, Dr. Seiden, the state's expert, disagreed with Dr. Geffner's statement that a person with a battered woman syndrome cannot make a decision. According to Dr. Seiden, a person with such a disorder may be afraid to make a decision, but that is different from not being able to make decisions. Dr. Seiden also testified that a battered woman usually will stay and let herself be subjected to abuse, but will make a decision to leave when she sees her child is in danger. He said, in the instant case, the defendant was making decisions constantly because a decision not to do something is a decision.
*628 The lay witnesses presented by the defense consisted of the defendant's father, her third cousin, and two of her friends. All of them admitted they really had no personal knowledge of the details of the defendant's relationship with Chris Sepulvado. Only the defendant's father really knew Sepulvado, and he had no knowledge of Sepulvado's drinking and the physical abuse inflicted upon Wesley.
The defendant argues that the case before us is "strikingly similar" to State v. Roy, supra. We conclude that State v. Roy is factually distinguishable. In Roy, three medical doctors testified that the defendant was a paranoid schizophrenic and had been hospitalized over the years on five separate occasions because of his mental disorder. There is no evidence of such a history with the defendant in the present case. The defendant in Roy was deemed incompetent to stand trial and had to be hospitalized for a period of time. In the present case, the defendant suffered no such fate. The expert witnesses in Roy cited the large amount of antipsychotics administered to the defendant as evidence of his insanity. The experts in the present case did not testify that the defendant required such intense treatment.
Finally, the state in Roy presented no controverting evidence and only contended that the defendant's flight after the offense and his subsequent submission revealed his sanity and knowledge that he did something wrong. In the instant case, the state presented expert testimony regarding the diagnoses made by other doctors. In Roy, the defendant's conviction was reversed because the Louisiana Supreme Court determined the defendant proved he was insane at the time of the offense by a preponderance of the evidence and no rational trier of fact could have found him sane on the record evidence. This finding cannot be made in the case before us.
Considering the totality of the record evidence in a light most favorable to the prosecution, we determine that a rational trier of fact could have found that the defendant did not prove her insanity by a preponderance of the evidence. Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Birdsong, 452 So.2d 1236 (La.App. 2d Cir.), writ denied, 457 So.2d 1200 (1984). The jury properly made its own credibility determinations and accorded the weight it deemed appropriate to each witness' testimony. The expert testimony presented by the state was fully sufficient to support the jury's finding. We conclude the jury did not err in rejecting the defendant's insanity defense.

EXCESSIVE SENTENCE
The defendant contends that the trial court erred in upwardly departing from the Sentencing Guidelines. She asserts that the trial court's upward departure from the guidelines lacks adequate support in the record, relies on aggravating circumstances totally unsupported by the record, reflects inadequate consideration of the substantial mitigating factors, and violates her rights under the Louisiana Constitution against excessive punishment.
The Louisiana Sentencing Guidelines are advisory in nature. State v. Smith, 93-0402 (La.1994), 639 So.2d 237. While a trial court must consider the Guidelines, the court has the complete discretion to reject the Guidelines recommendation and impose any sentence which is not constitutionally excessive, but which is within the statutory sentencing range for the crime for which the defendant has been convicted. LSA-C.Cr.P. arts. 881.4, 894.1; LSA-R.S. 15:321, 15:322, 15:326, subd. A, 15:328, subd. B; State v. Smith, supra. If the record reflects that the trial court considered the Guidelines, stated for the record the considerations taken into account, and enunciated a factual basis for the sentence imposed, the only issue left for appellate review is whether the sentence imposed is constitutionally excessive without regard to whether the trial court either employed or deviated from the guidelines. Id.
The trial court properly found the defendant fell into grid cell 1-G of the Louisiana Sentencing Guidelines. The sentence range recommended for that classification is 60 to 72 months at hard labor. In sentencing the *629 defendant, the trial court deviated upward from the Guidelines' recommendation and sentenced the defendant to 21 years at hard labor, the maximum statutory sentence for manslaughter at the time of her conviction. The manslaughter statute now permits a maximum sentence of 40 years at hard labor. See LSA-R.S. 14:31 B. The trial court further stated for the record the considerations it took into account.
The court considered as a mitigating factor that the defendant has no particular history of criminal conduct, but considered as aggravating factors the vulnerability of the six-year-old child, the defendant's failure to aid her child in his time of greatest need, the defendant's use of her status as the child's mother to facilitate the commission of the offense, and the manifestation of deliberate cruelty to the victim. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The record demonstrates that the sentencing court adequately complied with the provisions of LSA-C.Cr.P. Art. 894.1. Therefore, the only issue remaining for this court is whether the 21-year sentence is constitutionally excessive.
Whether the sentence imposed is constitutionally excessive depends on the circumstances of the case and the background of the defendant. A sentence is excessive and violates the Louisiana Constitution, Art. 1, Section 20 (1974), when it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Richardson, 545 So.2d 714 (La.App. 2d Cir.1989). The sentencing judge is given wide discretion in imposing sentence within the statutory limits and such sentence should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983).
Maximum or near maximum sentences are to be reserved for the worst offenders and the worst offenses. LSA-Const. Art. 1, Sec. 20; State v. Jordan, 26,265 (La. App.2d Cir. 9/21/94), 643 So.2d 309. The trial court in the instant case noted particularly that the defendant's six-year-old son was beaten, tortured, and scalded in a manner which led to an especially cruel and heinous death. In its written reasons for sentence, the trial court stated:
In determining a sentence that is appropriate under the circumstances of this case, the court has reviewed a wide range of appellate decisions dealing with appropriate sentencing range and after such review is of the opinion that no other sentence other than the maximum sentence allowable by law can come close to adequately addressing the crime which this defendant has committed, which in essence is the crime of abandoning her own child in his greatest hour of need and thereby causing his death.
We conclude that the 21-year sentence imposed is "tailored to both the offender and the offense, is not grossly out of proportion to the severity of the offense and does not constitute needless and purposeless imposition of pain and suffering." See State v. Bolden, 501 So.2d 942 (La.App. 2d Cir.1987); State v. Lloyd, 535 So.2d 885 (La.App.2d Cir.1988); State v. Anseman, 607 So.2d 665 (La.App. 5th Cir.1992), writ denied, 613 So.2d 989, 990 (1993). It does not shock our sense of justice. The aforementioned factors clearly differentiate this case from the typical manslaughter case and justify the sentence imposed.

CONCLUSION
We affirm the conviction and sentence of the defendant, Yvonne Mercer Sepulvado.
AFFIRMED.