760 So.2d 576 (2000)
STATE of Louisiana, Appellee,
v.
Cecil ODOM, Appellant.
No. 33,340-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 2000.
*579 Louisiana Appellate Project by Gwendolyn K. Brown, Baton Rouge, Allan R. Harris, Shreveoprt, James E. Calhoun, Natchitoches, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Ross S. Owen, Assistant District Attorneys, Counsel for Appellee.
Before BROWN, PEATROSS, KOSTELKA, JJ.
KOSTELKA, J.
A unanimous jury found Cecil Odom ("Odom") guilty of two counts of first degree murder, La R.S. 14:30. After the jury failed to agree on a sentence, the trial court imposed consecutive life sentences, without benefit of parole, probation or suspension of sentence, on each count. Odom appeals his convictions. We affirm.

FACTS
On the morning of July 25, 1997, Odom and his eighteen-year-old adopted daughter, Casey Dempsy Odom ("Casey"), traveled out of town[1] to pick up Casey's grandmother, Opal Marie Anglin ("Anglin"). Casey and her grandmother planned to leave for a North Carolina vacation the following day. The three returned to the Odom home at approximately 1:30 p.m. Thereafter, Odom went to work. Sharon Odom ("Sharon"), Odom's wife of fifteen years, returned from work at approximately 5:30 p.m. Sometime later, Odom called Sharon and asked her to pick up something from him at work when she, Casey and Anglin went out to eat. After doing so, the three returned home at approximately 8:00 p.m. and prepared for bed. Odom returned home from work at approximately 10:15 p.m. Thereafter, Anglin went to bed in Casey's room. At some point, Casey and Odom began to argue; Casey called Odom "stupid." Odom told Casey to go to bed. She complied. When Sharon asked Odom if he was all right, he told her to leave him alone so that he could cool down. Sharon also went to bed.
In his statement to police, Odom claimed to have then sat in his living room recliner thinking of ways to retaliate against Casey for hurting him. He retrieved a butcher knife from the kitchen, but then went to bed because he had not slept for three days. Because Odom's sleep attempts were thwarted by Sharon's snoring, he placed a pillow over her face and stabbed her multiple times. Sharon screamed for Casey, ran out of the bedroom and hid behind the living room couch and attempted to call 911. When she saw Odom go to Casey's room, Sharon ran out of the house and waited by the door. When Odom confronted Anglin in the bedroom she was sharing with Casey, Odom fatally stabbed Anglin numerous times. He then grabbed Casey, throwing her across the room and stabbing her in the throat, severing her carotid artery. Casey fled the room and from outside Sharon saw her fall in the foyer. At some point, Odom removed Casey's shorts and panties. Odom saw Sharon standing outside and yelled for her to come into the house, but she went to a neighbor's house. Odom then stabbed himself in the abdomen and called 911, reporting that he had stabbed himself, his wife, daughter and her grandmother and that an ambulance was needed.
When police arrived, Odom was seated in his recliner with a knife protruding from *580 the right side of his stomach. Casey, then still alive, was transported to a hospital where she later died after surgery. Anglin was pronounced dead at the scene. Police arrested Odom who confessed that he knew what he was doing and had planned to do it.

DISCUSSION

Insanity Defense
Contesting the verdict as insufficient to prove his guilt beyond a reasonable doubt, Odom argues that the evidence was insufficient to convict him of two counts of first degree murder. Specifically, Odom claims that the jury erred in finding that he did not prove by a preponderance of the evidence that he was insane at the time of the offenses and, therefore, could not have possessed the requisite specific intent to kill or inflict great bodily harm. Odom does not dispute that he murdered Casey and Anglin.
Specific intent to kill or inflict great bodily harm is an element of first degree murder. La. R.S. 14:30. Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982). Specific intent is that state of mind which exists when the circumstances indicate that an offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982).
In reviewing the correctness of such a determination, the court should review the evidence in the light most favorable to the state and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La. R.S. 15:432. To rebut the presumption of sanity and to avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652; State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 32. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Silman, supra.
The determination of sanity is a factual matter. State v. Sepulvado, 26,948 (La.App.2d Cir.05/10/95), 655 So.2d 623, writ denied, 95-1437 (La.11/13/95), 662 So.2d 465. All evidence, including expert and lay testimony, along with the defendant's conduct and actions, should be reserved for the fact-finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact-finder a rational basis for rejecting unanimous medical opinions that the defendant was legally insane at the time of the offense. State v. Silman, supra.
Expert testimony is relevant to the issue of whether the defendant is insane, but even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Horne, 28,327 (La.App.2d Cir.08/21/96), 679 So.2d 953, writ denied, 96-2345 (La.02/21/97), 688 So.2d 521; State v. Sepulvado, supra.
On appeal, the relevant inquiry is, whether under the facts and circumstances of the case, any rational fact-finder, viewing the evidence in the light most favorable *581 to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time he committed the offense. State v. Silman, supra.
After due consideration of the evidence presented at trial regarding the issue of Odom's insanity defense, we find no error in the jury's determination that he possessed the requisite specific intent to commit the two murders.
The expert medical testimony relating to the insanity defense included the testimony of Dr. Paul Ware ("Ware"), an expert in the field of psychiatry, who spent approximately six to ten evaluation hours with Odom. In Ware's opinion, Odom suffered from schizo-affective psychosis and intermittent explosive disorder to such a degree that he was not aware of the "wrongness of his behavior" at the time of the murders. Ware attached importance to Odom's family history which included mental illness, primarily in the form of manic depressive illness or bipolar mood disorder. Ware also noted that Odom had recently been under the psychiatric care of Willis Knighton Hospital in Shreveport, from July 7-21, 1997. The hospital doctors diagnosed Odom with "[B]ipolar disorder, depressed, severe, cyclothymic personality with borderline features." Ware explained that bipolar mood disorder is characterized by fluctuations in moods. During the accelerated hyper state, thinking and behavior are racing and out of control. The hyper state is followed by clinical depression where the person is tearful, agitated, sad and suicidal. The hypomanic state is more dangerous than the depressed phase in many ways, because the person becomes more of a danger to others. Ware explained that the police officers' description of Odom's incessant talking after his arrest was a classic finding of hypomanic phase, bipolar disorder or schizo-affective disorder because a person with such a disorder is incapable of containment or censoring.
Dr. Charles Armistead ("Armistead"), also an expert in psychiatry,[2] opined that Odom was in a manic phase of manicdepressive psychosis on the night of the murders; he felt that the murders were out of control, maniacal, insane acts by Odom. He felt that Odom was not in control of his impulses, the murders were not predetermined, and that Odom had no motive.
Dr. Lee Stephens, an expert in psychiatry at LSU Medical Center, evaluated Odom on July 28, 1997, approximately two days after the murders. During that examination, he detected no signs of a manic state. He explained that signs of mania include rapid speech, flight of ideas, and even hallucinations. During a follow-up evaluation on July 30, 1997 (during Odom's recuperation at LSU Medical Center), he detected no signs of acute mania and Odom denied having any hallucinations.
Dr. George Seiden ("Seiden"), accepted as an expert in forensic psychiatry, diagnosed Odom with intermittent explosive disorder. He explained that this is a disorder in which a person's expression of anger or rage exceeds what would normally be expected in response to the stimulus. The rage is usually followed by remorse. Seiden described the disorder as repetitive. Seiden noted that Odom's history, which reflected that he drove, had normal conversations, went to work, functioned normally, came home and had an argument on the day of the murders, is not consistent with either manic-depressive psychosis or schizo-affective psychosis.
Although the medication which Odom took caused him to feel drugged or foggy at work, there was no indication that Odom was manic, overly excited or irritable *582 as he performed his job duties. Nor could these medications preclude Odom's ability to distinguish between right and wrong. Seiden also attached importance to Odom's family history which indicated that Odom grew up in a home in which angry outbursts or blowups were common. Also important to his conclusion was Odom's hospitalization the week prior to the incident which was precipitated by another explosive episode in which Odom choked Casey. Seiden did not feel that Odom's previous minor head injuries indicated any significant impairment or brain damage. Evaluations performed by other psychiatrists, which indicated some mild organic brain dysfunction, did not impress Seiden. He felt that, although this type of dysfunction would have some effect on Odom in the work setting, in terms of his putting ideas together, there was no evidence that this condition would cause impulse control problems.
In Seiden's opinion, Odom was angry at the time of the murders. Although it was not important to Odom whether his actions were right or wrong, he clearly knew what he was doing and was fully capable of discerning right from wrong at the time of the murders.
Seiden testified that his opinion differed from the other psychiatrists because Odom's history is not consistent with the diagnosis of bipolar disorder. Seiden testified that nowhere in Odom's history was there an episode that would qualify as a major depressive or manic episode. Seiden felt the evidence was very compelling that the stabbings did not occur while Odom was in a manic state. On the day of the murders, there was no indication that Odom suffered from distractibility, irritability, bizarre behavior, difficulties with concentration or functioning. Important to Seiden was the fact that Odom convinced Casey not to start an argument with her grandmother as the three drove back from Natchitoches on the morning of the incident. Seiden concluded that this behavior was inconsistent with a person during a manic episode. Moreover, Seiden explained that manic episodes do not occur for brief moments in time; rather, manic episodes begin slowly and persist for periods of time and then end slowly. Seiden indicated that Odom's behavior during his 911 call reflected only that he was upset about what had just occurred, but that he had no flight of ideas or pressured speech. Seiden also indicated that Odom's behavior at the hospital immediately following the murders was not manic.
Seiden also felt that Odom's history was inconsistent with schizo-affective disorder. He distinguished schizo-affective disorder from bipolar disorder. He explained that a person with schizo-affective disorder does not function as well as an individual with bipolar disorder because schizo-affective disorder does not include complete inter-episode remissions; schizo-affective disorder is exhibited by psychotic episodes which are of the depressed type. At times, a person suffering from schizo-affective disorder will have hallucinations or be delusional without a prominent disturbance in mood. Odom's background included no history of such behavior.
Dr. Errington Thompson, the trauma surgeon who treated Odom when he was brought to the LSU Medical Center on July 26, 1997, noted that Odom exhibited no psychotic or manic behavior at that time. He did not check for signs of mental disorder and testified that his primary concern was trauma.
The remaining evidence included Odom's 911 call made to police. Therein, Odom specifically recounted the series of events leading up to and including the murders. Odom informed the operator that he had tried to kill his wife and probably killed his daughter. As Odom's call was being transferred to police, he was heard to say, "You had a beautiful body." Odom informed the operator of his name and address. When asked about the age of his daughter, Odom responded that she was eighteen and had been stripped naked. He also told the operator that his wife was *583 at the end of the driveway and that he was standing over Casey who was stabbed in the neck. He informed the operator that she was still alive. Odom became agitated as the operator continued to ask questions. He informed the operator that Casey had called him stupid. He also told her that he had just gotten out of the psychiatric ward and about the medications he was taking. Odom asked God to forgive him and informed the operator that if the emergency personnel hurried, they could save Casey's life. Odom then informed the operator of Sharon's substance abuse problem and that he had adopted Casey and loved her even though it did not seem like it. Odom stated that he wanted the police to save Casey because she did not deserve this. When the police arrived at the scene, Odom was heard begging them to save Casey's life. Odom also told the police to check on Anglin in the bedroom.
Officer P.L. Samuels ("Samuels") of the Shreveport Police Department ("SPD") responded to the crime scene. As he entered the house, he first saw Casey lying on the floor naked; he remembered that she was gasping for air. The officer then saw Odom seated in his recliner. Samuels told Odom to remove his hands from the knife; Odom responded that he could not. Eventually, Samuels got Odom to remove his hands and he then placed him in handcuffs. As he explained Odom his rights, Samuels remembered that Odom told him that he knew his rights; he knew exactly what he was doing; and, he had planned to do this. Samuels described Odom as being "very methodical." Odom told Samuels that he traveled to Natchitoches to pick up the grandmother in order to kill them all the next day. He explained that he intended to kill them the next day, but his wife started snoring. Odom confessed to getting mad and upset and to grabbing a knife and stabbing Sharon repeatedly. Odom also told Samuels that there was someone else in the house the officers needed to check; he was referring to Anglin. Samuels described Odom as extremely coherent; Odom spoke fluently and appropriately answered the questions asked of him. Samuels indicated that Odom never seemed disoriented or dazed. Although Odom spoke fast, everything he said made sense. Samuels felt that Odom was in his right mind.
SPD Officer Clyde Smith also responded to the crime scene. As he walked into the house, he also first saw Casey on the floor. He then noticed Odom in his chair. He heard Odom tell Samuels that he had stabbed his wife and his daughter. He heard Odom say that his daughter had called him stupid and that had made him mad. He heard Odom admit that he went into Casey's room and stabbed her grandmother and Casey. Smith observed that as Odom spoke to Samuels, he appeared coherent, understood the questions asked of him and gave no indication that he was not in his right mind.
SPD Officer Tim Gray rode with Odom to the hospital. He first spoke with Odom at the hospital. Gray testified that at the hospital Odom seemed very calm and relaxed, spoke coherently and clearly and in complete sentences. In Gray's opinion, Odom appeared alert and oriented. Odom again repeated to this officer that he and his daughter had gotten into an argument about her leaving for vacation the following day. Odom indicated that Casey had teased him about having to go back into the hospital to get his brain checked out. This made Odom very upset. He told his wife to go to bed, but he sat in his recliner thinking of ways to get Casey back for calling him names. Gray testified that Odom claimed to have then gone to bed, but because Sharon was snoring, he could not get to sleep. He took out a pillow, placed it over Sharon's head and then stabbed her. He then went into the daughter's room where he stabbed and killed the grandmother and, when Casey confronted him, he cut her throat.
Kenneth Browder ("Browder"), a paramedic with the Shreveport Fire Department, responded to the crime scene. *584 When he arrived, he first saw Sharon in the yard. Although she was bleeding, she was able to stand on her own. He went into the house and saw Casey lying on the floor and Odom sitting in his chair. The paramedics later found Anglin in the bedroom. After Browder treated Sharon, he began treating Odom. At the time Browder first came into the house, Odom was on the phone with 911. Browder took the phone from Odom and hung it up. He described Odom as calm and well-mannered at the crime scene. Odom also told Browder that he planned the entire thing.
SPD Officer Paul Robinson ("Robinson") took two statements from Odom. The first was at the hospital in the early morning hours of July 26, 1997, and the second on July 30, 1997, upon Odom's discharge from the hospital. Robinson felt that Odom was oriented as to time and place when he made the statements. In the first statement, Odom waived his right to an attorney. Odom admitted that what he did was wrong and that he had to pay the price. Odom admitted that he took Anglin's life and that she had never done anything to him. Odom systematically recounted his July 7, 1997 stay in the psychiatric ward of a hospital. He stated that he was suicidal and that his psychiatric evaluation determined he was volatile with anger and aggression and that he easily could have killed someone. In his statement, Odom specifically told the events prior to and leading up to the murders. Odom told Robinson that he and Casey had an argument and that she "smart mouthed" him. Casey provoked him to anger that he could not control. Casey teased him and he threatened her. When Sharon asked him what was going on, he told her to go to bed. After Casey and Sharon went to bed, he thought of ways to retaliate against Casey for hurting him. He went into the kitchen and got a butcher knife. Odom could not sleep because Sharon was snoring. He placed a pillow over her face and stabbed her. He then went into Casey's room where Anglin confronted him. He stabbed Anglin and then grabbed Casey. He threw her across the room and stabbed her in the throat. As Casey stumbled down the hallway, Odom cut off her shirt and then jerked her shorts and underwear down. He claimed to have stated: "There, you're naked before me and I don't give a damn." Afterwards, Odom sought to have Sharon come inside the house. When she refused, Odom told her "Here is how sick I am" and stabbed himself. He then called 911. Odom asked about Sharon and stated that he was truly sorry.
Odom made his second statement to Robinson on July 30, 1997, in a police interrogation room after his discharge from the hospital. In that statement, Odom, again, consistently narrated the facts leading up to and including the murders.
Sharon testified that in her opinion Odom did not understand what he was doing when he stabbed her, Casey or Anglin. She testified that after Odom and Casey's argument, Odom started to shake, sweat and became cold and clammy. Sharon revealed that Odom was first treated for episodes of anger in 1994. She felt that Odom had a lot of anger and resentment stored up because of his abusive childhood. After his fourteen-day stay in the hospital the week before the incident, Odom seemed withdrawn and distant and had slurred speech. Sharon admitted that she is a drug addict. Under intense crossexamination, she also admitted that her license as a registered nurse had been revoked and that she had been arrested on drug charges.
Viewing this evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have concluded beyond a reasonable doubt that Odom failed to prove his insanity by a preponderance of the evidence. The question of sanity is a factual matter to be determined by the jury. Clearly, Seiden's impressive testimony showed that Odom was capable of discerning right and wrong at the time of the incident. Seiden was the only *585 doctor board certified in forensic psychiatry. He had reviewed much more information than the other doctors, including listening to the taped recordings of Odom's 911 call and his police interviews. The jury obviously accepted his testimony over the other experts' opinions. We can discern no error in this credibility determination. Equally impressive is the lay testimony and evidence which showed that Odom repeatedly and methodically confessed both to the crime and its planning. He remained able, during his 911 call and hospital treatment, to specifically recount each and every detail of the events leading up to and including the murders. In his statements to the police, both immediately after the murders and some five days later, he calmly repeated all of the details. The overwhelming lay evidence shows that throughout the entire ordeal, Odom remained calm and cooperative. The jury obviously made its own credibility determinations and accorded the weight it deemed appropriate to each witnesses' testimony. Because evidence exists which supports its conclusion that Odom was sane at the time of the offenses, we find the jury determination to be a reasonable one. Accordingly, we find no merit to this argument.

Other Crimes Evidence
Assignments of error numbers two and three complain that the trial court erroneously allowed undisclosed, prejudicial and irrelevant other crimes evidence to be introduced at trial. Odom also argues that the trial court erred in failing to instruct the jury as to the limited admissibility of other crimes evidence.
During the state's cross-examination of him, Ware indicated he had no doubt that Odom murdered Casey and Anglin. The state then asked Ware, "What about intention to possibly rape Casey?" The defense objected based upon the grounds of other crimes evidence and orally moved for a mistrial, or in the alternative, requested a jury admonishment. The court denied the motion, finding that the probative value of the evidence outweighed any undue prejudice. The trial court did not instruct the jury as to the limited admissibility of other crimes evidence; defense counsel did not object to the omission.
Then, during the state's questioning of Seiden on rebuttal, the prosecutor asked, "Of what significance did you assign [to] the fact that [the defendant] said that he was sitting in his chair trying to think of ways to get Casey back?" Seiden answered that "... [the defendant] was sitting in his chair being angry at her and thinking of ways to retaliate which included raping her." The defense made the same objection which the trial court overruled. Again, the trial judge failed to instruct the jury regarding the limited admissibility of other crimes evidence and Odom failed to object on those grounds.
We cannot agree with Odom's classification of this evidence as other crimes evidence. Both statements refer only to Odom's thoughts which do not qualify as a crime, wrong or act contemplated by the provisions of La. C.E. art. 404(B). Moreover, such evidence is relevant to the issue of whether Odom was able to distinguish right from wrong at the time of the offense.
Even if somehow considered as other crimes evidence, Odom's thoughts formed an integral part of the crime. Though generally inadmissible, evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1); State v. Coates, 27,287 (La.App.2d Cir.09/27/95), 661 So.2d 571, writ denied, 95-2613 (La.02/28/96), 668 So.2d 365. In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving the immediate context of happenings near in time and place. State v. Colomb, 98-2813 (La.10/01/99), 747 So.2d 1074. The concomitant other *586 crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. State v. Wafer, 31,078 (La.App.2d Cir.09/23/98), 719 So.2d 156, writ denied, 99-1114 (La.10/01/99), 747 So.2d 1137.
The integral act doctrine thus reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness. State v. Colomb, supra, quoting from Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Therefore, the test of integral act evidence simply is not whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. Id. No pre-trial notice is necessary for such evidence. La.C.Cr.P. art. 720.
Moreover, any error in the admission of the evidence would have been harmless given the remaining evidence introduced against Odom at trial. See State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Odom repeatedly confessed that he planned to and did kill the victims; medical and lay testimony showed that he was sane at the time of the crimes. Accordingly, any error in the admission of other crimes evidence would have resulted in no prejudice to Odom.
Finally, because Odom failed to object both on the grounds of relevance and the trial court's failure to instruct the jury regarding other crimes evidence, he is precluded from raising these issues on appeal. La.C.Cr.P. art. 841; State v. Clayton, 427 So.2d 827 (La.1982). We, accordingly, find no merit to Odom's claims regarding the admissibility of this evidence or the trial court failure to instruct the jury as to its limited admissibility.

EEG
Odom finally argues that the trial court erred in denying his request to have an EEG performed upon him as was recommended by Armistead, a member of the sanity commission appointed by the court.
After the state rested its case, defense counsel informed the court that it had contacted Armistead who stated that based upon additional information he received in this matter, he thought an EEG would be helpful. Accordingly, defense counsel requested that an EEG be performed on Odom. The trial court denied the request based upon the fact that Armistead had been available to the defense throughout the course of the proceedings. At the time of this ruling, Odom failed to object. Nevertheless, he raised the issue in his motion for new trial and in arrest of judgment after trial, arguing that the trial court erred in failing to allow the procedure which could have disclosed evidence of brain damage. The trial court again denied this motion without stated reasons.
On appeal, Odom argues that the denial of his request deprived him of a right to a fair trial and to present a defense. Odom is precluded from raising this issue on appeal, however, because he failed to make a contemporaneous objection. La.C.Cr.P. art. 841.
Moreover, we find no error in the trial court ruling. We agree with the classification of the request as untimely. The undertaking of such proceedings would have caused considerable and undue delay in the proceedings. Odom made no pre-trial request for an EEG but rather sought the test after the state had rested its case in chief. He also made no attempt to explore the possibility of brain damage *587 during Armistead's testimony despite the fact that this witness had been involved in the case from the time of the appointment of the sanity commission, and testified on Odom's behalf. Moreover, Seiden testified that he did not request an EEG because that test was one of the least sensitive ways to detect organic brain damage. A trial court is vested with wide discretion in determining relevancy, and its ruling will not be disturbed on appeal in the absence of abuse. State v. Plater, 26,252 (La.App.2d Cir.09/21/94), 643 So.2d 313, writ denied, 94-2608 (La.02/03/95), 649 So.2d 402. Considering the foregoing, we find that the trial court properly exercised its discretion in denying Odom's request. We reject this argument.

CONCLUSION
For the foregoing reasons, we affirm Odom's convictions and sentences.
AFFIRMED.
NOTES
[1] The evidence is conflicting as to whether they traveled to Jena or Natchitoches, Louisiana.
[2] Armistead had been appointed by the trial court to serve on the sanity commission which had earlier determined that Odom was mentally capable of proceeding to trial. At the time of the sanity commission report, Armistead did not render an opinion on Odom's sanity at the time of the offenses.