766 So.2d 771 (2000)
STATE of Louisiana, Appellee,
v.
Mary E. APPACROMBIE, Appellant.
No. 33,551-KA.
Court of Appeal of Louisiana, Second Circuit.
September 12, 2000.
*772 Kurt J. Goins, Counsel for Appellant.
Richard P. Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Jason W. Waltman, Assistant District Attorneys, Counsel for Appellee.
Before WILLIAMS, STEWART and KOSTELKA, JJ.
WILLIAMS, J.
The defendant, Mary E. Appacrombie, was indicted by a grand jury for second degree murder, a violation of LS-R.S. 14:30.1. The defendant entered a plea of not guilty and not guilty by reason of insanity. After a jury trial, the defendant was found guilty as charged and sentenced to serve life imprisonment without benefit of probation, parole or suspension of sentence. The defendant appeals her conviction and sentence urging that the trial court erred in denying her motion for "Post-Verdict Judgment of Acquittal By Reason of Insanity." For the following reasons, we affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On May 6, 1997, the defendant confronted the fifteen-year-old victim, Quana Myles, and her sixteen-year-old cousin, Joyce Collins, as they were walking through the rear of a vacant lot located at 2908 Darien Street in Shreveport, Louisiana. The defendant was standing in her yard behind a fence. She approached the two girls and asked, "Are y'all bitches looking for me?" After the girls responded "No," the defendant produced a handgun, pointed it at the girls and fired. The victim was shot in the back of her head as she and her cousin attempted to flee. A report of the crime, which identified the defendant as the suspect, was made almost immediately to the police department from the defendant's home.
Shortly after the shooting, Shreveport police officer Randy W. Bordelon stopped the defendant for a traffic violation approximately four blocks from the scene of the shooting. During this routine traffic stop, Officer Bordelon heard a police dispatcher's broadcast of the shooting and noticed that the address of the shooting matched the address on the defendant's driver's license. When Officer Bordelon questioned the defendant about the shooting, the defendant informed him that she had reported the shooting. After being *773 advised of her Miranda rights, the defendant informed Officer Bordelon that she had "shot a gang member in the head" on Darien Street because the gang member "had been messing with my kids." She also informed the officer that the weapon was under the front seat of her car. Shreveport Police Officer Dennis R. Pratt arrived at the scene of the traffic stop and the defendant informed him that she understood her rights. She consented to the search of her vehicle and the seizure of her.45 caliber firearm from under the driver's seat.
The trial court ordered a sanity commission and appointed Drs. Charles Armistead and Gregory Brown to evaluate the defendant. The sanity commission concluded that the defendant was competent to proceed to trial and could assist counsel in preparing her defense. Dr. Brown opined that the defendant was not competent at the time of the offense. However, Dr. Armistead opined that although he believed the defendant's mental state was disturbed at the time of the offense, he did not know either the extent of this disturbance or whether it was related to her previous brain surgery. Dr. Armistead felt that these issues could only be determined by a complete review of the patient's records and the observation of the patient contemporaneous to the shooting.
The defendant was indicted for second-degree murder. She entered a plea of not guilty and not guilty by reason of insanity. The jury found her guilty as charged by vote of 11 to 1. She was sentenced to serve life imprisonment without benefit of probation, parole or suspension of sentence. The trial court denied the defendant's motion for post-verdict judgment of acquittal by reason of insanity. The defendant appeals.

DISCUSSION
Louisiana law presumes a defendant is sane and responsible for his or her actions. LSA-R.S. 15:432. However, this presumption is rebuttable and the defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. LSA-C.Cr.P. art. 652; State v. Colvin, 452 So.2d 1214 (La.App. 2d Cir.), writ denied, 457 So.2d 1199 (La.1984).
Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question. LSA-R.S. 14:14; State v. Colvin, supra. In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, this court applies the test set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The appellate court, viewing the evidence in the light most favorable to the prosecution, determines whether any rational trier of fact could have found that the defendant had not proved by a preponderance of the evidence that she was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94), 643 So.2d 1222; State v. Sepulvado, 26,948 (La.App.2d Cir.5/10/95), 655 So.2d 623, writ denied, 95-1437 (La.11/13/95), 662 So.2d 465.
The determination of sanity is a factual matter reserved to the jury or other fact finder. Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Sepulvado, supra. "All evidence, including expert and lay testimony, besides the defendant's conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense." State v. Horne, 28,327 (La.App.2d Cir.8/21/96), 697 So.2d 953.
*774 Police Detective H.J. Burak tried to interview the defendant about two hours later. She acknowledged her rights and declined to speak until she could consult with an attorney. The victim was pronounced dead early the next day. The police again gave the defendant her Miranda warnings. She again acknowledged her understanding of her rights and declined to speak without first talking with an attorney.
Joyce Collins told the police that the defendant's daughter, April, had been in a fight the day before the homicide with another neighborhood girl. Collins opined defendant may have thought the victim was the same girl.
April Appacrombie informed the police that her mother had a "run in" with the victim about three weeks before the homicide. According to April's statement to the police, during that incident, the victim, Collins and an unknown black female had been next door to the defendant's house calling her a bitch and a whore.
The defendant's sister, Lora Smith,[1] informed the police that the victim was a gang member. The school counselor, Raymond Green, informed the police that Lora Smith had informed him that the victim had been stalking the defendant's daughter for almost a year. Green also said students had informed him the victim was a member of a "blood-affiliated" gang. However, Green admitted that he could not corroborate the information concerning the victim's gang affiliation.
The defendant offered both lay and expert testimony regarding her family and medical history to support her defense of insanity. The defendant's sisters, Lisa and Lora Smith, both testified that because the defendant experienced seizures, she underwent brain surgery. A temporal lobectomy was performed to correct the seizure disorder. The defendant's sisters testified that the defendant became angry and violent after the surgery and was somewhat of a recluse.
Lisa Smith testified that after the surgery, the defendant stayed close to home and on occasions when the defendant had to go to the store, she refused to go alone. Lisa also testified that after the surgery, the defendant often accused her family of practicing voodoo against her, and ultimately, defendant sought assistance in "getting the voodoo off of her."
Lora Smith testified that, the defendant had a "nerve problem" prior to the surgery, and after the surgery, the defendant's nerves "got really bad." Lora further testified that she felt the close relationship that she had with the defendant deteriorated as a result of the defendant's brain surgery. Lora testified of an incident where the defendant stabbed her and wrote a letter of apology several hours later. As a result, Lora received stitches, but did not require extended hospitalization. The incident was not reported to the police. Lora was not sure of the year that this incident occurred or whether it occurred before or after the defendant's brain surgery. According to Lora, she had not done anything to provoke the defendant.
Lora Smith also testified that prior to her surgery, the defendant was a quiet person and her life was centered around her home and her children. According to Lora other than taking her children to and from school and going to church, the defendant stayed around her house and built dog houses in her spare time. Lora further testified that this routine continued after the defendant underwent surgery, except the defendant stopped building dog houses.
Tameka Snell, the defendant's cousin, testified of an incident with the defendant that occurred five to six years prior to the *775 trial. According to Tameka, she and another cousin were in a room with the defendant while the defendant was talking on the telephone. Tameka and her cousin were laughing and talking when the defendant confronted them and struck Tameka. According to Tameka, she assumed that the defendant struck her because defendant believed that she and her cousin were too noisy.
Ida Mae Smith, the defendant's mother, testified that the defendant continued to have seizures after she had the brain surgery and that there were instances when she would have three or four seizures a day. Ida Smith testified that there was one instance when the defendant had a "nervous breakdown" and had to be restrained after she was found running in the street screaming, "Take me Jesus, take me." She further testified that, when the defendant is taking her medication as prescribed, she "acts good," but when she is not taking her medication, she is prone to believe things that are not true. According to Ida Smith, approximately two weeks after her arrest, the defendant incorrectly believed that her baby was dead.
Several doctors testified on behalf of the defendant. Dr. Joe Ben Hayes, a board-certified psychiatrist, met with the defendant at the request of the staff at the Caddo Correctional Center. He interviewed the defendant six days after she arrived at the facility. When she first entered the facility she was confused and could not give an adequate medical history. Although Dr. Hayes testified that he neither observed the defendant having a seizure, nor received a report of her having a seizure, he prescribed Tegretol, an antiseizure medication, to reduce neurotransmission impulse. Dr. Hayes testified that he personally interviewed the defendant on two occasions. He stated that he was with the defendant for fifteen to twenty minutes during the first interview and approximately ten minutes during the second interview.
Dr. Paul D. Ware, an expert in psychiatry and neurology, was retained by the defendant to conduct a psychiatric evaluation of the defendant. Dr. Ware evaluated the defendant in terms of her competency to stand trial and her sanity at the time of the offense. In conducting his evaluation, Dr. Ware interviewed the defendant for approximately two hours and reviewed her medical records from the Social Security Administration, the Supplemental Security Income program and Louisiana State University Medical Center. He also reviewed the defendant's records from her surgery and subsequent records from Shreveport Mental Health Center. He examined the record of the preliminary examination and listened to the testimony of defendant's family members during trial. Dr. Ware concluded that the defendant was competent to stand trial; however, she was legally insane or not aware of the consequences of her actions at the time of the offense. Dr. Ware opined that the defendant was "acutely psychotic and delusional at the time of the offense." He explained that "psychosis" means that a person does not have proper reality testing and is not aware of what is really going on around him or her. Dr. Ware further testified that the defendant's behavior, including the previous stabbing of her sister and accusing her family of trying to poison her food or practicing voodoo on her, was consistent with psychosis. According to Dr. Ware, a person is not psychotic all of the time and does have the ability to function normally. He stated that the intensity of their psychotic behavior determines how they function.
Dr. Ware based his opinion on the fact that the defendant had a significant abnormality of the brain, which resulted in a seizure disorder and in a temporal lobectomy. Dr. Ware testified that the temporal lobe is the main lobe of the brain that is associated with memory and the ability to retain information when it is presented to you. He explained to the jury that a temporal lobe seizure occurs when a person behaviorally acts bizarre and differently, *776 and the person may be aggressive. According to Dr. Ware, "People who have temporal lobe seizures don't know what they're doing and cannot control it." He further testified that the defendant's brain surgery left her Awith loss of a significant part of the lobe so that her seizures continued, and she, of course, was left with significant memory deficit and poor impulse control." He further opined that "the brain surgery modified how she saw the world and she then started to be paranoid and suspicious. [This behavior] would increase whenever the electrical activity in this lobe wasn't regulated." After reviewing all of the medical and psychological information, Dr. Ware opined that the defendant was not on the appropriate level of medication prior to committing the offense. He stated that she may have been taking only one Tegretol instead of the prescribed dosage of four. He noted that the defendant improved as the dosage increased and her outbursts occurred only when she was not taking her medication as prescribed. However, he also testified that even if on the proper medication, the abnormality is still present and the medication only controls the "seizure burst." Dr. Ware testified that he could not determine whether the defendant had a seizure on the date of the offense; however, he concluded that she did experience abnormal firing from the temporal lobe. He also testified that he had not seen any evidence that the defendant was faking, exaggerating or malingering.
Dr. Gregory Brown, an expert in adult, adolescent and child psychiatry, was one of the two doctors who served on the sanity commission. In evaluating the defendant, Dr. Brown conducted an interview with the defendant fifteen months after the homicide and reviewed the defendant's case history, including tests performed by Dr. Mark Vigen, an expert in adult and clinical psychology. Dr. Brown also reviewed records documenting occasions after the brain surgery when the defendant was hospitalized for paranoid and aggressive behavior with aural and visual hallucinations, the police reports from the date of the offense, notes from Shreveport Mental Health Center and notes from her treatment at Caddo Correctional Center. Dr. Brown spent approximately ninety minutes with the defendant in August 1998 and approximately six hours reviewing her records.
Dr. Brown concluded that the defendant was competent to stand trial, but she was not competent at the time of the offense, i.e., she did not know right from wrong. Dr. Brown testified that during his interview of the defendant, she informed him that during April and/or May 1997, she had reduced the dosage of her medication to avoid drowsiness. Dr. Brown opined that this decrease in the dosage of medication led to an increase in the defendant's paranoia. Dr. Brown agreed with Dr. Ware that the defendant's story about the victim being a gang member who had some history of conflict with her daughter did not constitute conscious lying. Instead, it is considered "confabulation" or an attempt to fill in the gaps or breaks in an effort to understand or comprehend her behavior. Dr. Brown testified that, as in defendant's case, the loss of the temporal lobe causes judgment to be significantly impaired and a loss of the ability to control anger. He also testified that psychotic persons "flux in and out from having a paranoid, guarded, aggressive type of a state to being more lucid and comprehending and understanding what is going on."
Dr. Charles Armistead, was accepted by the court as an expert in psychology and neurology. Dr. Armistead, a psychiatrist and an attorney, was also a member of the sanity commission. Dr. Armistead interviewed the defendant for approximately forty-five minutes and reviewed her medical records. He noted that the defendant's EEG which was administered during the month of the trial indicated that she had extensive brain damage and that the absence of the temporal lobe would result in some loss of the ability to control her emotions. Dr. Armistead opined that at *777 the time of the homicide, the defendant was "probably severely impaired in reality testing and was probably in a confused psychotic state when these events occurred." Dr. Armistead further testified that the defendant could go from an apparently normal state to a very violent, psychotic state within five to ten seconds. He felt defendant's psychotic state could last from approximately one and one-half to two minutes, and she then could go into a dazed state.
Dr. Armistead opined that at the time of the offense, the defendant probably had a psychomotor seizure, which essentially is synonymous to being in an altered state of consciousness. He further opined that at the time of the offense, she was unable to distinguish between right and wrong. Dr. Armistead agreed that if an individual showed signs of psychosis over a long period of time and the behavior at the time of the offense was consistent with the prior behavior, the psychosis would not be a concoction.
Dr. Mark Vigen, an expert in adult and clinical psychology, interviewed the defendant and requested a variety of tests to be conducted by a neuropsychological technician. Dr. Vigen reviewed the police reports, the preliminary examination transcript, all of the testimony in this case, written interviews with the defendant's family members, her medical records, her records from the Social Security Administration and her records from Shreveport Mental Health Center.
Dr. Vigen concluded that the defendant has very low intelligence and moderate brain impairment. According to Dr. Vigen, the defendant's brain damage caused several impairments, including a "severe" inability to control her emotions and her behavior. He opined that the defendant's act, in killing Quana, was not rational and was the result of her brain impairments. Dr. Vigen concluded that the defendant did not know right from wrong at the time of the offense.
The defendant had the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. The record reflects that the defendant had an organic brain impairment, which resulted in surgery to remove a large portion of her left temporal lobe. The medical experts all agreed that the removal of her left temporal lobe adversely affected her ability to perceive reality and to control her emotions. Her family testified regarding several episodes of inexplicable violent behavior by the defendant. However, we note that these episodes did not include extremely bizarre activity. Compare, State v. Armstrong, 94-2950 (La.4/8/96), 671 So.2d 307. The medical testimony revealed that the defendant's behavior could be controlled by Tegretol, a medication designed to control seizures. Drs. Ware and Brown opined that the defendant was not taking the prescribed dosage of medication at the time of the offense, which led to her psychotic state of mind. Dr. Ware testified that the notes from the mental health center where the defendant was treated indicated that during defendant's visits in March and April 1997, she was taking the proper dosages of medication and her behavior was appropriate.
The evidence presented by the defense requires the fact finder to assume that immediately prior to the offense the defendant was not taking the prescribed dosage of medication, she suffered a short temporal seizure at the time of the offense and she did not know what she was doing when she killed Quana Myles. However, there was no evidence presented to establish the defendant's physical or mental condition or her actions immediately prior to or during the offense.
In State v. Sepulvado, supra, the court held that even where experts opine that the defendant is insane, the issue is for the jury to decide. According to State v. Horne, supra, "if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution *778 must be adopted." Further, as previously stated, lay testimony concerning the defendant's actions may give the fact finder a rational basis for rejecting expert medical opinion that the defendant was legally insane at the time of the offense. State v. Horne, supra.
As stated above, there was no proof that the defendant had a seizure at or near the time of the homicide as the experts had assumed. The defendant spoke rationally, even if erroneously, to Quana Myles and her cousin. The jury could rationally conclude that the defendant shot a girl who she thought was harassing her daughter. The defendant acted appropriately at the traffic stop, including admitting what she had done and cooperating with the police officers. Immediately after the shooting, the defendant telephoned the police. The jury could infer that this behavior was an indication that the defendant was aware that her conduct was wrong. Considering the totality of the evidence viewed in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the defendant did not prove her insanity defense by a preponderance of the evidence.
This assignment of error is without merit.
The defendant's final assignment of error is a request for this court to review the record for errors patent. This request is unnecessary since such a review is made automatically in all criminal cases. State v. Stamper, 615 So.2d 1359 (La.App. 2d Cir.1993), modified on other grounds, 624 So.2d 1208 (La.1993); State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556. No error patent is noted.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The defendant's sister, Lora Smith, was also known by the name of Barbara Ann. Police records refer to "Lora" as "Laura."