836 So.2d 1165 (2003)
STATE of Louisiana, Appellee,
v.
James W. GLEASON, Appellant.
No. 36,774-KA.
Court of Appeal of Louisiana, Second Circuit.
January 29, 2003.
*1166 Louisiana Appellate Project By: Carey J. Ellis, III, Rayville, for Appellant.
*1167 Richard Ieyoub, Attorney General, William R. Coenen, Jr., District Attorney, Johnny R. Boothe, Penny Douciere, Assistant District Attorneys, for Appellee.
Before STEWART, GASKINS & PEATROSS, JJ.
PEATROSS, J.
Defendant, James W. Gleason, was charged by bill of information with armed robbery in violation of La. R.S. 14:64.[1] Defendant ultimately pled not guilty and not guilty by reason of insanity and waived his right to a trial by jury. After the bench trial, he was found guilty as charged and subsequently sentenced to 30 years at hard labor without the benefit of probation, parole or suspension of sentence. A motion to reconsider sentence was filed and denied and Defendant now appeals his conviction and sentence. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY
On April 26, 2000, at approximately 12:40 p.m., Defendant entered the Gilbert Branch of the Winnsboro State Bank with the intention of robbing it. While the door to the bank is normally locked during this time, the two employees who were present, Claudine Prather and Vickie Collins, mistakenly assumed it would be safe to allow Defendant to enter, since he appeared to be well dressed and he was carrying a briefcase. Once inside, Defendant began to ask numerous questions about the procedures for opening a new business account. After a few minutes, he opened his briefcase and pulled out a .45-caliber handgun, which he pointed at the two women. Defendant began to make demands, telling them not to set off any alarms and also questioned them about the layout of the bank. During the initial encounter, Defendant spoke on a cellular phone, informing someone: "It's quiet. It's only two of them." He told the women he had back up to call in if they did not cooperate. Defendant then removed what appeared to be dynamite or a bomb from his briefcase and laid it on the desk.
Ms. Collins and Ms. Prather testified that it appeared that Defendant knew certain fundamental procedures about banking security that an ordinary person might not be aware of, insisting, for example, that the victims not give him any "bait" money, and carefully looking in every place where money was normally hidden. After he had the two women place approximately $118,000 into a trash bag, which he had retrieved from the bank lobby, he instructed one of the women to retrieve the videotape from the security camera. Defendant then locked the woman in the restroom and told them that, if they attempted to open the door, the bomb he had attached to the doorknob would go off. Defendant left the bank in a rented vehicle. When another co-worker returned from lunch, she released the two victims. After calling 911, the women waited outside the bank, fearing the building would explode. It was later determined that the bomb was fake. The victims were able to give police a description of the perpetrator, including identifying marks such as a tattoo on his wrist, his clothing, shoes, etc. The victims also gave a description of the perpetrator's car and its direction of travel.
Shortly after the robbery, Tensas Parish Deputy Kenneth Morgan received a "be on the lookout" (BOLO) on the vehicle and suspect involved in the bank robbery. The BOLO described the perpetrator as a white male driving a newer model gold *1168 automobile with no tag information. Deputy Morgan testified that he observed a vehicle matching the description driving south on Highway 65, passing other vehicles in an unsafe manner. Deputy Morgan stopped the vehicle. Deputy Morgan reported that the driver of the vehicle, Defendant, was coherent and calm. Since Defendant matched the description of the suspect, two additional officers were sent to the location of the stop. Defendant consented to a search of the vehicle, which revealed an automatic pistol in the front seat and a large plastic bag filled with cash in the back floorboard.
Defendant was arrested and, during his transport back to Franklin Parish, he voluntarily stated that the "fat lady had finally sung," and "his kids should be proud of him now," and that he was bankrupt and needed the money. A full search of the vehicle yielded a .38-caliber Smith and Wesson revolver, an AK47-assault weapon, a fully semi-automatic UZI, a fake bomb, fake tattoos (including packaging for one he had placed on his wrist), fake license plates and the bank security tape. Also discovered was a notebook with entries pertaining to additional small town isolated banks and a roll of electrical tape. Both Ms. Collins and Ms. Prather identified the Defendant in a photographic line-up shortly after the robbery.
After arraignment, at which he pled not guilty, Defendant retained counsel who raised the issue of Defendant's mental capacity to proceed. A sanity commission was appointed; however, the record indicates that Defendant refused to cooperate with the examining psychiatrists. The court, therefore, ordered Defendant to the Eastern Louisiana Mental Health System for evaluation to determine his capacity to proceed and assist counsel and to determine his sanity at the time of the alleged offense. The evaluators concluded that Defendant was mentally capable of proceeding and assisting in his defense and the court entered judgment to that effect. Defendant then withdrew his plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity, based on his alleged involuntary intoxication resulting from his use of the anti-depressant Prozac.
At trial, the State presented the testimony of the arresting and investigating officers, the victims and other witnesses who established the facts of the armed robbery as well as Defendant's behavior at the time of the commission of the crime and shortly thereafter. The defense stipulated that the State had proven all of the elements of the offense, but focused on Defendant's alleged Prozac-induced mental incapacity which prevented Defendant from distinguishing right from wrong at the time of the offense. After a six-day bench trial, Defendant was found guilty as charged.[2]

DISCUSSION
On appeal, Defendant raises two assignments of error: (1) the sufficiency of the evidence and (2) excessive sentence.

Sufficiency of evidence/insanity defense
Defendant urges that the evidence was insufficient to support a guilty verdict; he contends that he was insane at the time of the offense and, thus, the proper verdict should have been not guilty by reason of insanity. The State, however, maintains that Defendant failed to meet his burden of proof regarding his defense of insanity; *1169 and, therefore, the defense was properly rejected by the trial judge. The State further submits that the record fully supports the judge's findings and the conviction should be affirmed. We agree.
Louisiana law presumes a defendant is sane and responsible for his or her actions. La. R.S. 15:432. This presumption is rebuttable, however, and the defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La. C.Cr.P. art. 652; State v. Appacrombie, 33,551 (La.App.2d Cir.9/12/00), 766 So.2d 771, writ denied, 00-2856 (La.10/5/01), 798 So.2d 961; State v. Colvin, 452 So.2d 1214 (La.App. 2d Cir.1984), writ denied, 457 So.2d 1199 (La.1984).
Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Appacrombie, supra; State v. Colvin, supra. The standard of review when a defendant pleads the affirmative defense of insanity and claims the record does not support a finding of guilty beyond a reasonable doubt is whether, under the facts and circumstances of the case, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94), 643 So.2d 1222; State v. Appacrombie, supra; State v. Sepulvado, 26,948 (La.App.2d Cir.5/10/95), 655 So.2d 623, writ denied, 95-1437 (La.11/13/95), 662 So.2d 465. In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, this court applies the test set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The determination of sanity is a factual matter reserved to the jury or other fact finder. Expert testimony is relevant to the issue of whether a defendant is insane; but, even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Appacrombie, supra; State v. Sepulvado, supra.
All evidence, including expert and lay testimony, besides the defendant's conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense.
State v. Horne, 28,327 (La.App.2d Cir.8/21/96), 679 So.2d 953. A trier of fact may accept or reject the opinion expressed by a medical expert. State v. Reese, 34,275 (La.App.2d Cir.12/20/00), 774 So.2d 1164; State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27. The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. Id. A reviewing court accords great deference to a fact finder's decision to accept or reject the testimony of a witness in whole or in part. State v. Sepulvado, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
As previously stated, Defendant does not dispute that he committed the armed robbery. Defendant took $118,000, which was in the immediate control of Ms. Prather and Ms. Collins, from the Winnsboro State Bank. He committed the armed robbery with the use of intimidation and force by leading the victims to believe they *1170 would be killed or seriously injured if they failed to comply with his demands. He was armed with a .45-caliber handgun and a fake explosive device.
The record contains clear evidence of premeditation and reveals that Defendant extensively planned the robbery. He "cased" the bank the day before the robbery, choosing a small, isolated bank at a time of day when only a few employees were present. The night before the robbery Defendant purchased the materials to make a fake explosive device, which he used to carry out the robbery. Defendant also applied a temporary tattoo on his wrist. He entered the bank armed with a handgun and the fake bomb (in a briefcase) and, after demanding money from one of the employees, placed a call on his cellular phone to an alleged "back up" individual(s) to make the victims believe he had an accomplice(s) ready to assist him if necessary. Defendant had prepared for the robbery by becoming familiar with banking practices such as knowing where the money was kept and how to ask for it. Specifically, he told the victims not to give him any "bait" moneyonly larger bills. After noting the presence of the security camera, he ordered one of the victims to retrieve the security tape. He locked the women in the restroom and left the bank in his rented vehicle. Found in the vehicle were more firearms, a make-up kit, additional license plates with magnets and notes on other small, isolated banks.
In addition, Defendant had committed an almost identical armed robbery of another small bank one year prior to this offense. Reba Tarpley, Manager of the Toledo Branch of the Sabine State Bank, testified that, on April 28, 1999, the Sabine State Bank was robbed in an almost identical manner as the Winnsboro State bank. The perpetrator of that robbery, identified at trial as James Gleason, was wearing similar clothes, used a gun and a fake bomb, told the victims that he had an accomplice, stated he did not want ones or fives or "bait" money and also retrieved the videotape from the security camera. Ms. Tarpley testified that Defendant had also been in the Sabine Bank a couple of days before that robbery "casing" the bank.
Despite his admission that he engaged in all of the above activities, Defendant claims that he was insane at the time of the offense. He testified that he had taken more than his prescribed dose of Prozac that day, which had caused him to drink excessive amounts of vodka and had rendered him unable to discern that his actions were wrong. Defendant argues that, prior to 1998, he was a "normal" person, that he behaved normally, spoke normally and thought normally. He emphasizes that he had even served time in the U.S. armed forces, graduated from college, married and had children. Defendant was also a successful businessman, primarily in sales. As a result of consultation with his family physician in 1998, however, he was diagnosed as being depressed and was prescribed Prozac. Defendant testified that, since his use of Prozac, he has suffered from depression, defects in his intellectual and cognitive functioning, as well as a wide array of other mental disabilities, including headaches, insomnia, night sweats, nightmares, paranoia and increased alcohol intake. Instead of continuing his life as a businessman, Defendant stated that he bought a motorcycle, wore a bandana, grew long hair and abandoned his family. He claimed that his value system was completely gone, he did not understand right from wrong and that he changed into another person without morals or principles.
Among those testifying on behalf of Defendant were several members of his family, each of whom related his or her perceived behavioral changes of Defendant *1171 after he began taking Prozac. These personality changes included Defendant not caring about his family, to which he had once been a loving and devoted husband and father, and his abandoning a successful business career to ride motorcycles and dress accordingly.
Dr. E.E. Johnstone, accepted by the court as an expert in general psychiatry, testified that Defendant suffered from Prozac-induced abnormal behavior at the time of the offense. Based upon his examination of Defendant, his meeting with the family and study of the records and reports, Dr. Johnstone concluded that Defendant "could distinguish that his crime was an improper act, but was unable to conform his actions." Specifically, Dr. Johnstone stated that Defendant "didn't care" whether his actions were legal or not. Dr. Johnstone further stated, "[o]h, I think he understood that he could get into some trouble, but I don't think he truly grasped thethe extent of the trouble he would be in." Dr. Johnstone explained that his conclusions support his finding that Defendant was unable to distinguish right from wrong at the time of the offense and this inability was the result of Defendant's taking Prozac. We find Dr. Johnstone's testimony to be contradictory and not tailored to the standard utilized by our courts in insanity cases. In Louisiana, the inability of a defendant to conform his or her behavior to a moral standard is not the relevant inquiry in a case involving an insanity defense. We do not find Dr. Johnstone's remarks to support a conclusion that Defendant was insane under Louisiana's standard, i.e., an ability to distinguish right from wrong at the time of the offense.
Dr. George Seiden was accepted by the court as an expert in forensic psychiatry and testified on behalf of the State. While both doctors agreed that Defendant is an alcoholic, Dr. Seiden disagreed with Dr. Johnstone regarding the effects of Prozac on Defendant's alcohol consumption and his criminal behavior. Dr. Seiden opined that Defendant's consumption of Prozac and alcohol did not cause his criminal actions and that, on April 26, 2000, Defendant was able to distinguish right from wrong. When questioned about the factors which led him to this conclusion, Dr. Seiden testified as follows:
A: Yes, sir. If I had no other information, if the only information I had was the information about him returning to get the video tape, the surveillance video tape, if I had only that piece of information that would tell me that he knew that what he was doing at the time was wrong because of his attempt to hide his involvement in that behavior. If that piece of information alone would be sufficient, but there's a lot of other information that supports that.
Q: What are the other factors that that would tend to confirm his ability to understand and distinguish between right and wrong?
A: Among them is the fact that he contemplated doing it and deliberated whether he should or should not have done that, that he said that he understood the potential consequences of his behavior and it wasn't that he didn't know it but that he didn't care that much about the consequences, and his statement to me during the evaluation that there has never been a time in his adult life when he did not know that robbing a bank was wrong.
Additional factors supporting Dr. Seiden's conclusion were the presence of temporary tattoos and a make-up kit, which would disguise his identity, and the additional license plates, which would assist him in getting away from the scene of the crime. Finally, Dr. Seiden opined that the prior bank robbery was "strong evidence against *1172 insanity" because it shows a pattern of behavior and his "ability to plan out the behavior [and] get away with the behavior." On this record, we conclude that a rational trier of fact could easily have concluded that Defendant failed to prove by a preponderance of the evidence that, due to mental disease or defect, he was unable to distinguish between right and wrong at the time of the offense. This assignment is without merit.

Excessive Sentence
Defendant argues that the 30-year sentence is excessive. He claims that the record fails to support the sentence and the trial court failed to consider mitigating factors. We disagree.
The test imposed by the reviewing court in determining the excessiveness of sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (La.1988). There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385; State v. Callahan, 29,351 (La.App.2d Cir.2/26/97), 690 So.2d 864, writ denied, 97-0705 (La.9/26/97), 701 So.2d 979.
La. R.S. 14:64 provides for a sentence on an armed robbery conviction of not less than 10 nor more than 99 years, without benefit of parole, probation or suspension of sentence. On June 18, 2002, Defendant was sentenced to serve 30 years at hard labor without benefit of probation, parole or suspension of sentence. A sentence which falls within the statutory limits may be excessive under certain circumstances. To constitute an excessive sentence, however, the court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158. The trial judge has broad discretion and a reviewing court may not set sentences aside absent a manifest abuse of discretion.
Defendant argues that the trial court failed to consider the factors in La.C.Cr.P. art. 894.1 in imposing sentence. According to Defendant, the trial court failed to adequately consider that he is a true first offender and his only other conviction was for a DWI, first offense in 1985. He also urges that he is college-educated, served successfully in the armed services and had a less than fortunate childhood. Further, Defendant states that, until his demise attributable to Prozac, he was a successful businessman and family man who always worked.
*1173 The trial court did, however, consider the guidelines found in La.C.Cr.P. art. 894.1. Those considerations, along with the facts found in the transcripts of the trial and the pre-sentence investigation report, provide an adequate basis for the sentence. Considering the same factors cited in mitigation by Defendant, we find the sentence to be justified. Defendant is highly educated and had an opportunity to make good choices. Due to his background or life-history, we cannot disagree with the trial judge that this crime is absolutely deplorable.
The trial court considered the dangerous nature of the crime and Defendant's calculated and detailed planning of the robbery. Armed with a .45-caliber handgun and what appeared to the victims to be dynamite or a bomb, Defendant demonstrated that he is extremely dangerous and exercises no restraint in obtaining his wants and desires, whether legal or illegal. Under these circumstances, the sentence imposed is tailored to the offender and the offense and does not shock the sense of justice or constitute a needless or purposeless imposition of pain and suffering.

CONCLUSION
For the foregoing reasons, James W. Gleason's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The bill of information was later amended to add charges of second degree kidnapping and use of a fake explosive device; however, only the armed robbery charge was tried and is the subject of this appeal.
[2] This case was initially allotted to Division C, Judge Rudolph McIntyre, Jr. presiding. After two days of trial, Defendant filed a motion to recuse, which was granted, and a mistrial declared. The case was then assigned to Division A, Judge Glen Strong presiding; and, after motions were re-heard and decided, Defendant's second trial commenced on March 25, 2002.