# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 07-794


**STATE OF LOUISIANA**

**VERUS**

**CALVIN JOSEPH COLEMAN**


**\*\*\*\*\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, DOCKET NO. C 6003
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\*\*\*\***
**SYLVIA R. COOKS**
**JUDGE**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Jimmie C. Peters, Judges.


**AFFIRMED.**

**Paula C. Marx**
**Louisiana Appellate Project**
**Post Office Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Calvin Joseph Coleman**

**Billy J. Harrington**
**Assistant District Attorney**
**10th Judicial District**
**Post Office Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**COOKS, Judge.**

## STATEMENT OF THE CASE

Calvin Joseph Coleman was indicted for second degree murder, a violation of La.R.S. 14:30.1. Initially, he pled not guilty then changed his guilty plea to not guilty and not guilty by reason of insanity. A sanity commission was appointed. On November 11, 2003, because of conflicting psychiatric evaluations, Coleman was remanded for further evaluation at the Eastern Louisiana Mental Health System Forensic Division (Feliciana). On October 7, 2005, Defendant was found capable of assisting with his defense.

Prior to trial, Coleman filed a motion to suppress inculpatory statements made to officers after his arrest. Following a hearing, the trial court denied the motion. The jury found Coleman guilty of second degree murder. He was sentenced to life imprisonment, without benefit of parole. Coleman appeals, asserting the following assignments of error:

1. The trial court erred in admitting his statements into evidence because at the time Coleman was in a delusional state.

2. The evidence is insufficient to support a conviction for second degree murder.

3. The trial court erred in limiting the expert testimony of psychiatrist Dr. Paul Ware.

For the reasons assigned below, we affirm the conviction and sentence of Calvin J. Coleman.

## LAW AND DISCUSSION

### *Sufficiency of the Evidence*

Defendant argues the State failed to sustain its burden of proof beyond a reasonable doubt that Defendant had the requisite specific intent to kill the victim. Defendant also argues he sustained his burden of proof by a preponderance of the

2

evidence proving he was insane at the time of the shooting and did not know right from wrong. In *State v. Leger,* 00-920, pp.1-2 (La.App. 3 Cir. 12/20/00), 775 So.2d 1169, 1170, *writ denied,* 01-240 (La. 3/15/02), 811 So.2d 1169, this court stated:

> When the sufficiency of the evidence is raised on appeal, this court must decide whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing the evidence, this court must keep in mind that it is the fact finder's role to weigh witness credibility, and we should not second-guess those credibility determinations beyond the sufficiency evaluations under the *Jackson* standard of review. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). However, "Due Process requires the reviewing court to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Mussall*, 523 So.2d 1305, 1308-09 (La.1988) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789).

Defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1(A)(1), which provides that second degree murder is the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." "Specific intent is defined as 'that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.' La.R.S. 14:10. Specific criminal intent may be inferred from the circumstances present in the case and the actions of Defendant." *State v. Reed,* 00-1537, p.7 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, 1266.

The following facts were established at trial. At approximately 11:00 a.m., Mark Hinton, an instructor at Louisiana Technical College, had just finished teaching a class when Coleman entered the classroom and began firing a gun at a student, Tyrone Sylvia. Hinton testified his back was toward the door when he heard the first shots fired. As he turned, he saw the victim fall to the floor. Hinton ran out of the classroom to the administrative office where he called the police. He testified at the

3

time he did not recognize the shooter but later recognized Coleman as one of his former students.

Nancy Murry, an instructor at the college, testified at approximately 11:00 a.m., she saw a young man, later identified as Coleman, standing quietly outside of the classroom where the victim was shot. She did not recognize the man, but they greeted each other "cordially" and she thought nothing more about it. Also, Joshua Moak, a student at the college, saw Coleman standing outside the classroom when he was on his way to the cafeteria for an early lunch. He stated they nodded to each other. Moak mentioned the classroom door had a rectangular window in the door, so the inside of the classroom could be seen. Kim Worsham, manager of the student bookstore, testified she saw Coleman a little after 11:00 a.m. standing outside the classroom. She recognized him as a former student of the school. She thought he might have been there to meet someone for lunch. She stated he seemed to have recognized her, but there was nothing that aroused her suspicion.

Ross Desadier, a sergeant with the Natchitoches City Police Department, testified he received a call about a shooting at the Louisiana Technical College. Upon arrival, he observed a man on the classroom floor. The victim was shot once in the forehead and twice in the back. There were a few casings and some bullets found on the floor by the body. The bullets were from a .380 caliber gun. Sergeant Desadier collected the bullets and casings and accompanied the body to a funeral home.

Doryce Polk, an officer with the Natchitoches Parish Sheriff's Office, testified she received a phone call from Coleman. She and two other officers went to the location from which Defendant had called. He met them as they drove up and, without resistence, they handcuffed him and put him into the police car. She stated she read him the *Miranda* rights. When she asked if he understood his rights, he

4

nodded his head affirmatively. She testified at one point he became agitated when his uncle walked behind the police unit with an officer and they began walking across the roadway toward a field. She stated Defendant said nothing to her.

Travis Trammel, a deputy with the Natchitoches Parish Sheriff's Office, testified when he arrived at the location in Clarence where the Defendant had surrendered, Defendant was sitting in back of the police unit. Deputy Trammel stated he entered the unit, *Mirandized* the Defendant, and asked him if he would talk to him. He testified Defendant said, "I just did what I had to do." He said initially Defendant declined to talk to him, but then stated: "It was him or me." The deputy asked where the gun was and Defendant responded he did not know. Upon further questioning, Defendant said he wanted to talk to a lawyer. Deputy Trammel then terminated the interview.

Deputy Trammel testified tracking dogs were later brought to the location, the dogs searched the field across the street, and located in a hole in the ground a chrome semi-automatic pistol wrapped in a towel. When asked how Defendant's demeanor was, Deputy Trammel testified he seemed nervous and scared, as if something "traumatic" had happened in his life.

Jeff Franks, a detective with the Natchitoches City Police Department, testified after the Defendant was brought into the police department, he attempted to interview him, but Defendant declined. Defendant signed a *Miranda* Rights form indicting he understood his rights and desired not to make a statement. Officer Franks testified after he had gone over Defendant's rights with him, he went outside. Within a few minutes, Defendant was taken outside for a smoke. Officer Frank stated while standing outside, Defendant laughed, then said. "I just can't believe I'm sitting here

5

laughing after what I just did." When asked how Defendant acted, Officer Frank said that he appeared calm and relaxed.

Julius Armstrong, a sergeant with the Natchitoches City Police Department, interviewed Defendant. Sergeant Armstrong testified at first Defendant did not want to talk and again signed a *Miranda* Warning form stating such, but within a short time the Defendant agreed to speak with him. Coleman stated he asked a friend to take him to town where he bought some items, including a bus ticket out of town. They talked about school and the friend asked about Mr. Hinton, who taught electronics at the Louisiana Technical College. They went to the library, then they went to the college because they wanted to speak with Mr. Hinton. Once they arrived at college, they learned Mr. Hinton had a class at the time, so they decided to leave. Coleman said he told his friend to wait for him in the car, he was going to go to the lavatory first. Defendant then went into the classroom and shot the victim. He stated he and the victim were having problems, that the victim had threatened him. Defendant indicated the problem was over two hundred dollars he owed the victim. He stated that he knew the victim had done time in prison, and he was afraid for his life.

In the statement, Coleman advised Sergeant Armstrong several times that his friend who took him to the school had nothing to do with the shooting. He said his friend was totally unaware of what was happening and he was innocent of any wrongdoing. Defendant said the friend then dropped him off at the Armory, and he threw the gun away into a field. He then rode to Clarence, where he was later taken into custody. Sergeant Armstrong testified Defendant was "calm, collective[sic], appeared to know what he was doing." The sergeant testified Defendant was not intimidated or threatened in any way. Nor were any promises made to get his confession.

6

Assistant Chief of the Natchitoches City Police Larry Vaughn testified the gun was found in the field across from where Defendant surrendered to the police, and it was the gun used to kill the victim. By Defendant's own admission, he shot the victim. Furthermore, his intent to commit the crime was demonstrated by the fact he first purchased a ticket out of town, then stood waiting outside the classroom door, entered the classroom, and fired several shots directly at the victim. This court has held that the act of aiming a firearm directly at a person and pulling the trigger can inferentially support a jury's finding that the Defendant had the requisite specific intent to kill. *State v. Clark,* 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, *writ denied,* 94-2715 (La. 1/9/95), 649 So.2d 418.

We find the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Defendant had the specific intent to kill the victim. Defendant, however, argues the specific intent requirement necessary to prove second degree murder was negated by the fact that he was suffering from a mental illness at the time of the shooting and as a result of the illness was not able to appreciate the wrongness of the act. In support of this defense, Coleman submitted the testimony of his mother, Sandra Coleman, and several relatives. Ms. Coleman testified the Defendant was living with her at the time of the shooting. She stated approximately three or four months prior to the shooting, Defendant's behavior changed radically. She stated there was never a problem with her son, no mental health issues, that he had always been a happy, stable person. However, he became so paranoid he would not allow her to go outside or answer the telephone. He stopped eating the food she cooked for him, often throwing the food out into the yard. Defendant admitted to her that something was wrong, but would do nothing about it. He paced and spit constantly and he told her "they gonna kill us all."

7

Gladys Coleman, Defendant's aunt, corroborated Sandra Coleman's testimony, stating she would call because she was so worried about the situation, but no one would answer the phone, so, she would call a neighbor to go and check up on the family. She stated Defendant scared her to the point where she did not want to be around him anymore. Claudine Hill, Defendant's first cousin, testified on a specific occasion, after being told about Defendant's behavior, she went over to the house and found Sandra Coleman sitting terrified in a chair and Defendant pacing back and forth. When she asked him what was wrong, he told her "if they'll do it to you, they'll do it to me." She stated he never told her who "they" were. Aretha McWrite, a long-time neighbor, testified Defendant had been a friend of her daughter and sometimes hung out at her house. She stated he was easygoing and always joking around, but in March 2005, about the time of the local football play-offs, she noticed that he had become increasingly nervous, to the point that when he visited he would lock the door behind him and peer anxiously out the windows. LaQuida Westin, the mother of Defendant's son, testified that Defendant became very distant toward his son prior to the shooting. She stated that normally he had a very good relationship with the boy and would spend a lot of time with him. Truly Coleman, Defendant's aunt, testified the Coleman family was a close-knit family and the Defendant had been a normal, happy person. A few weeks before the shooting, he told her he saw too much at school, and people were messing with people's minds over the internet.

Dr. Paul Ware, Chairman of the Department of Psychiatry at Louisiana State University Health Science Center in Shreveport, testified as an expert witness in psychiatry and forensic psychiatry on Defendant's behalf. Dr. Ware saw Defendant for the first time after he was released from Feliciana. He was ordered by the trial court to assess Defendant's capability to assist in his defense and to determine

whether Defendant was insane at the time of the shooting. Dr. Ware interviewed Defendant and his family and reviewed reports from the sanity commission and medical records from Feliciana. Particularly significant to him was the testimony he heard in court regarding Defendant's fear of what was happening at school. Dr. Ware stated, following that testimony, he questioned Defendant about it. Dr. Ware testified that "he said they were taking advantage of young girls and they were putting it on the internet and he truly did believe that without a doubt. He believed that and he felt like that he had to react to that and to do something to try to fix it." Dr. Ware said that from the descriptions of the changes in Defendant's behavior, he "was clearly suffering from a delusional disorder." Dr. Ware concluded that Defendant's disorder was based on false beliefs which, together with psychotic behavior, such as hearing voices, he could not resist. Dr. Ware opined that Defendant was "significantly impaired during that period of time." When asked if Defendant could distinguish between right and wrong when he shot the victim, he stated Coleman was suffering from a delusional disorder and "was not aware of the wrongness of his behavior at the time."

The State questioned Dr. Ware concerning the medical evaluation done on Defendant while he was at Feliciana. Dr. Ware admitted Feliciana had reported that Defendant "had little regard for others or opinions of society around him," that his "desire to be in control may lead to explorative [sic] or manipulative behavior on his part," and that "the probability of fainting [feigning] of the defendant is high, about 98%." The State pointed out Dr. Wheat's evaluation of Defendant indicated Defendant may have been malingering.

In *State v. Silman,* 95-154, p. 7 (La. 11/27/95), 663 So.2d 27, 32, the Louisiana Supreme Court said:

9

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters,* 94-0283 (La. 10/17/94); 643 So.2d 1222; *State v. Nealy*, 450 So.2d 634 (La.1984); *State v. Price,* 403 So.2d 660 (La.1981); *State v. Claibon,* [395 S.2d 770 (La.1981)]; *State v. Roy*, 395 So.2d 664 (La.1981).

In *Silman,* the supreme court set forth the standard and burden of proof when a defendant claims insanity at the time of the offense, as follows:

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; *State v. Williams*, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. *State v. Bibb,* 626 So.2d 913 (La.App. 5th Cir.1993), *writ denied*, 93-3127 (La. 9/16/94); 642 So.2d 188; *State v. Claibon*, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters,* [94-0283 (La.10/17/94), 643 So.2d 1222]; *State v. Claibon, supra*.

*Id.* at 32.

In *State v. Appacrombie,* 33,551 (La.App. 2 Cir. 9/12/00), 766 So.2d 771, *writ denied*, 00-2856 (La. 10/5/01), 798 So.2d 961, the second circuit affirmed the jury's verdict of guilty, despite abundant expert testimony of Appacrombie's inability to distinguish right from wrong when she shot a teenage girl who she thought was bullying her daughter. Five doctors, including Dr. Ware, testified Appacrombie was

10

suffering from a mental illness when she shot the victim. The doctors testified she was psychotic and delusional. Appacrombie had problems with seizures and had a temporal lobectomy, which did not seem to stop the seizures. There was testimony she exhibited violent behavior prior to the lobectomy and there was testimony she exhibited violent and irrational behavior following the surgery. However, the second circuit found the jury could have inferred from her behavior that she was aware her conduct was wrong. She spoke rationally at the time of the shooting, she acted appropriately when she was apprehended, admitted what she had done, and cooperated with the police officers. She immediately called the police on her own accord.

Applying the law to the facts in the present case, we find the trier of fact could have found concluded Defendant failed to prove by a preponderance of the evidence that he was incapable of appreciating the wrongness of his act. Defendant planned his actions deliberately, purchased a bus ticket out of town, hid the weapon, called the police on his own volition, surrendered to the police calmly, and insisted that his friend who drove him to and from the school was innocent of any complicity with the shooting. While the testimony indicated Defendant may have been suffering from a mental illness, there was no evidence that he did not understand right from wrong when he killed the victim.

### *Motion to Suppress*

Defendant asserts the trial court erred when it denied his motion to suppress statements made to the police shortly after the shooting. The Defendant argued he had diminished mental capacity, and he suffered a mental illness at the time of the shooting; therefore, his statements admitting he shot the victim were not voluntary

11

and not admissible at trial. In *State v. Dugar,* 93-718, p.17 (La.App. 3 Cir. 10/5/94), 643 So.2d 870, 880, this court stated:

> Before the state may introduce into evidence what purports to be a confession or statement of a defendant, it must first affirmatively show that it was freely and voluntarily given and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.Code Crim.P. art. 703(G); La.R.S. 15:451. In addition, if the statement was made during custodial interrogation, the state must prove that the accused was advised of his *Miranda* rights and intelligently and voluntarily waived those rights. La. Const. Art. I § 13 (1974); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Coleman,* 395 So.2d 704 (La.1981).
>
> To meet its burden the state may rely on the presumption of sanity provided in La.R.S. 15:432. Because of this presumption, the defendant has the burden of proving a mental defect which renders him unable to understand his rights and, therefore, incompetent to waive them. *State v. Glover*, 343 So.2d 118 (La.1977). The state is not required to negate a defendant's mental abnormality, but it must prove beyond a reasonable doubt that the confession or statement a defendant gave was voluntary. The defendant must then prove the existence of a mental defect or disorder that prevented his confession or statement from being intelligently and voluntarily made. *State v. Glover,* supra. However, the law is clear that when the issue on appeal is whether an accused's level of intellectual capacity precludes him from effectively understanding the essential nature of his right to remain silent, to have assistance of counsel, and of the consequences of his speech, much discretion is accorded to the trial court's determination. *State v. Lefevre*, 419 So.2d 862 (La.1982); *State v. Ashworth,* 554 So.2d 271 (La.App. 3d Cir.1989), *writ denied,* 561 So.2d 113 (La.1990).

In *State v. Verret*, 06-1337, p. 11 (La.App. 1 Cir. 3/23/07), 960 So.2d 208, 216,

the First Circuit stated:

> The admissibility of a confession is, in the first instance a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether or not a confession is admissible. [*State v.*]*Plain*, 99-1112 [(La.App. 1 Cir. 2/18/00),]at p. 6, 752 So.2d [337]at 342.

A hearing was held on the motion to suppress. Detective Jeff Franks with the Natchitoches City Police Department testified he interviewed Defendant at the police department shortly after Defendant was brought to the station. He stated he read Defendant his *Miranda* rights, following which Defendant indicated he did not want to speak. Detective Franks stated he read each of the five rights shown on the form to Defendant and asked specifically if he understood. Defendant indicated he understood and wrote "yes" on the form next to the question, "Do you understand each of these right I have explained to you?" and "no" next to the question, "Having these rights in mind, do you wish to talk to us now?" Defendant initialed each response and signed the form with witnesses. Moreover, Defendant wrote down his address and the date on the form. Detective Franks then testified he stepped outside for a cigarette. About thirty minutes later, Sergeant Armstrong brought Defendant outside for a cigarette. He asked Detective Franks to keep an eye on Defendant. The detective stated that while he was standing within five feet of him, Defendant laughed and then said, "I could not believe that I am able to laugh after what I did. But he deserved to die, though." Detective Franks stated no one was speaking to Defendant. The detective said Defendant was just sitting there relaxed, "I mean it's like he just got through taking a bath and was relaxing."

Julius Armstrong, a sergeant with the Natchitoches City Police Department, testified he came into contact with Defendant at the police department shortly after Defendant declined to talk to Detective Franks. The sergeant stated that, using the *Miranda* rights form, he *Mirandized* Defendant. He specifically asked Defendant about his educational background. Defendant told him he had graduated from high school and attended two years of a vocational school, and had been in the military. Detective Armstrong stated Defendant did not appear to be on any drugs or alcohol.

He informed the detective he did not want to speak without a lawyer. Again, Defendant signed a form indicating he understood his rights and did not want to speak at that time. Sergeant Armstrong testified at this point, he took Defendant outside for a cigarette.

When Defendant returned from smoking the cigarette, he started telling the sergeant about the shooting. Sergeant Armstrong stopped him and once again *Mirandized* him and had him sign the form indicating he wished to talk about the incident. The sergeant stated Defendant appeared confident, calm, and coherent. He made eye contact. Moreover, Sergeant Armstrong testified there were no threats, intimidation, or any promises made to invoke the confession. Sergeant Armstrong testified there was nothing to indicate to him that Defendant suffered from a mental illness at the time he gave his statement.

Finally, Detective Travis Trammel testified he spoke with Defendant just after he was taken into custody in Clarence. He stated he had been informed Defendant had gone out into the field across the street, and he thought perhaps Defendant had tossed the gun into the field. He stated he got into the police car with Defendant and asked him where was the gun. He said he had been told Defendant had been *Mirandized* already, but he gave him another verbal warning of his rights and Defendant indicated he understood. He stated Defendant appeared nervous, stressed, sweaty, and said, "I just did what I had to do. It was either him or me." The detective stated Defendant then declined to speak with him, at which time he terminated any conversation with Defendant.

While Defendant did not present any witnesses at the hearing, he submitted to the trial court the psychological evaluations of Drs. Wheat and Bienvenue, and the report issued by Feliciana at the time of his commitment in May 2005. Defendant

14

argued it had been determined he was not capable of assisting in his own defense and was committed to Feliciana; therefore, he was not capable of giving voluntary statements to the police. He argued the police should have known from the circumstances that he suffered from a mental defect because of the fact that he shot someone in broad daylight, in front of witnesses, went home, lied initially about where the gun was, and there was never a true motive established for the shooting. Accordingly, his confession was involuntary and not intelligently made.

In its ruling, the trial court noted that the initial evaluations of Defendant were indeterminate: one physician stated he was capable of proceeding, and the other physician stated he was not. The trial court found:

> At any rate, this points out that this is not a clear, this is not a clear issue here. Even at that time and that is you know a number of years afterwards, well I'm sorry. Originally even a psychiatrist back in the fall of that year couldn't make a determination that he was not able to. The evidence clearly shows from the evaluation of the officers of the individual that he was advised of his rights. It was a spontaneous statement made and the Court finds that it was a spontaneous. It was not coerced and it was not initiated because the officers asked a question. Uh, and I find that all of the, all of the uh, Miranda Rights were given at all of the appropriate times by all of the officers that were involved. They were evaluated by the officers and determined that he didn't appear anything but normal to them so they took the statement. Now after the fact that some, that some facts did not uh, pan out to be true as argued by Mr. Guillet while that's a very good argument, it, I don't think pans out in all cases. Because when people give confessions they don't always tell all of the truth when they do that. So I don't think that's a factor in determining whether or not it's free and voluntary. So I find that the statement was free and voluntary and uh, can be admitted into evidence.

We agree with the trial court and find the State met its burden of proving Defendant's confessions were voluntary and intelligently made and Defendant did not meet his burden of proving a mental defect rendering him incapable of understanding his rights and, therefore, incompetent to waive them. Defendant relies heavily on a deposition of Dr. Ware. In the deposition, Dr. Ware stated that the improper

15

questioning techniques used by the officers impacted Defendant's statements and that most certainly "it would be very difficult if not impossible for someone suffering from a psychotic delusional disorder, which he was, to be able to testify as to what happened--be voluntary." A reading of the interview conducted by Sergeant Armstrong indicates Defendant spoke freely and was not cut off or misdirected. In a narrative, Defendant described the morning with his friend leading up to the time where he stood outside of the classroom, awaiting an opportunity to enter and shoot the victim. Defendant had the presence of mind to insist that his friend, who drove him to school, was not involved in the crime. Moreover, two of the inculpatory comments he made were spontaneously made. The taped confession was made after he spontaneously began to confess, was stopped, and was reminded of his right to remain silent. We find no merit to this argument.

### Testimony of Dr. Ware

Defendant argues he was deprived of the right to an effective defense when the trial court ruled Dr. Ware could not testify as to the improper interrogation technique employed by Sergeant Armstrong. The defense sought to admit the testimony of Dr. Ware to the effect that the defendant's statement given to the police after the shooting could not be believed because of the method of questioning used by the police. The State objected. The trial court allowed Dr. Ware to testify as to whether the defendant knew right from wrong at the time of the offense and his state of mind both before and after the shooting. In addition, the Court allowed Dr. Ware to generally testify about the effect particular police questioning might have on individuals with certain mental conditions. We find no merit to this argument.

16

*Excessiveness of Sentence*

Defendant argues a sentence of life imprisonment is excessive considering that he "committed the offense under the influence of an abnormal mental state." Louisiana Revised Statutes 14:30.1 provides for a sentence of life imprisonment without the benefit of parole. The trial court has no discretion to impose any other sentence after a conviction for second degree murder. The Defendant argues the circumstances presented in this case are unusual and a lesser sentence is warranted. While there is authority for the trial court to impose an alternative sentence, the burden of proof is on the Defendant to establish "because of unusual circumstance[s] . . . [he is] a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstance of the case." *State v. Young,* 94-1636, pp 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied,* 95-3010 (La. 3/22/96), 669 So.2d 1223. We find the Defendant failed to rebut the presumption that the sentence is constitutional by clear and convincing evidence. *See Appacrombie,* 766 So.2d 771. *See also, State v. Pierre,* 02-277 (La.App. 3 Cir. 6/11/03), 854 So.2d 954, *writ denied,* 03-2042 (La. 1/16/04), 864 So.2d 626.

## DECREE

Based on the foregoing review of the record, the conviction and sentence of Calvin Joseph Coleman is affirmed.

**AFFIRMED.**